# UNITED STATES COURT OF APPEALS

# FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

GARY ALLEN LOTT,

      Defendant - Appellant.

No. 00-6141

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JOHNNY MARTON LOTT, aka
Johnny Martin Lott,

      Defendant - Appellant.

No. 00-6200

### ORDER
Filed November 5, 2002

Before **EBEL**, **HENRY**, and **BRISCOE**, Circuit Judges.

This matter is before the court on appellant's petition for rehearing in

00-6200 filed on August 23, 2002. The petition for rehearing is granted.

Therefore, the court's opinion in 00-6141 and 00-6200, filed July 30, 2002, is

vacated and a revised opinion addressing the changes in Sections VI and VII is attached. The mandate issued in case 00-6141 is recalled. The District Court Clerk shall return the recalled mandate forthwith.

Entered for the Court
PATRICK FISHER, Clerk of Court


by:
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 5 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

GARY ALLEN LOTT,

      Defendant - Appellant.

No. 00-6141[*]

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JOHNNY MARTON LOTT, aka
Johnny Martin Lott,

      Defendant - Appellant.

No. 00-6200

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 99-CR-30-T)**

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case therefore is ordered submitted without oral argument.

**No. 00-6141, Submitted on the Briefs:**

J. David Ogle, Martin Law Office, Oklahoma City, Oklahoma, for Defendant-Appellant Gary Allen Lott.

Daniel G. Webber, Jr., United States Attorney, and Frank Michael Ringer, Assistant United States Attorney, Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

**No. 00-6200:**

Howard A. Pincus, Assistant Federal Public Defender (Michael G. Katz, Federal Public Defender, with him on the brief), Denver, Colorado, for Defendant-Appellant Johnny Lott.

Frank Michael Ringer, Assistant United States Attorney (Daniel G. Webber, United States Attorney, with him on the briefs), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **EBEL**, **HENRY**, and **BRISCOE**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Gary Lott and Johnny Lott were indicted[1] and convicted by a jury of various counts in connection with a conspiracy to manufacture and distribute of

---

[1] Gary's and Johnny's brother, David Ray Lott, and Gary's nephew, Greg Allen Lott, were also indicted as co-defendants. Greg Allen Lott entered a guilty plea prior to trial, and co-defendant David Ray Lott was acquitted at trial on the two counts charged against him.

methamphetamine. These co-defendants at trial now bring separate appeals alleging various errors by the district court, which we address in this single opinion. Specifically, they both claim that their sentences run afoul of Apprendi v. New Jersey, 530 U.S. 466 (2000). Gary Lott also contests the district court's failure to suppress the testimony of certain government witnesses and its denial of his motion for a judgment of acquittal on a firearm possession charge. Johnny Lott challenges the district court's admission of exhibits that he claims are hearsay and its failure to hold a hearing on his motion for substitute counsel. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court in all regards except for the district court's ruling denying Johnny Lott an evidentiary hearing on his claim of a total breakdown of communications with his counsel. As to that claim, we REVERSE and REMAND.

## I. Background

This conspiracy case involves a methamphetamine manufacturing and distribution operation operated out of three residences in the Oklahoma City area: 2418 Southwest 24th Street, 4725 South Triple X Road, and 201 Hawk Drive. Johnny Lott allegedly used the residence of Jeff Wright, the 24th Street house, in connection with his distribution of methamphetamine. In October and November of 1998, an Oklahoma City Police Department (OCPD) paid informant, Judy

Jackson, made controlled buys from Johnny Lott, which an OCPD officer observed in an undercover capacity. David Arnold also obtained methamphetamine from Johnny Lott. At trial, Judy Jackson, Jeff Wright, and David Arnold all testified about the defendants' activities in connection with the methamphetamine manufacturing and distribution operation. Both Judy Jackson and Jeff Wright entered into plea agreements with the government in which they were promised leniency for their testimony in this case. Ms. Jackson also received $3,450 from the FBI for her cooperation in the case.

On January 9, 1999, a search of the Triple X Road and Hawk Drive residences revealed clandestine methamphetamine labs. A United States Postal Service form for the address of 201 Hawk Drive also was found in a bedroom at the Hawk Drive residence. The form, entitled "Rural Customer Delivery Instructions," contained an instruction to "enter names of people who may receive mail at your address." The names Johnny Lott, David Lott, and Greg Lott were hand-written on the form. At trial, the government sought to introduce the form as Exhibit 68. It also presented evidence at trial connecting Gary Lott to both of these properties, including several utility bills in his name and a rental agreement for the Triple X Road property.

On January 21, 1999, OCPD Officer Danny Fitzwilliam recognized a yellow wrecker, which he associated with the January 9th search of the Triple X

Road and Hawk Drive residences, pulling out of the parking lot of the Chieftan Motel. The officer pulled into the parking lot and observed Gary Lott walking from the motel to a red Camaro parked in front of the room. He then saw Gary get "in the driver's side door and lean[] over the driver's seat inside the vehicle." The officer observed Gary Lott look up, get out of the car, close the door, and begin walking away from the Camaro and the hotel room. The officer proceeded to arrest Gary Lott and entered the room that he believed Gary Lott had been exiting. In the room he observed an older revolver and a police scanner, and he noticed a strong smell associated with meth labs. He encountered Nicole Hatcher, Gary Lott's girlfriend, at the doorway, and they spoke outside by the Camaro. The officer then looked down and observed a nine-millimeter Sig-Sauer sitting on the driver's seat of the Camaro that Gary Lott had previously exited. He confiscated the gun and found various chemicals involved in the manufacturing of methamphetamine inside the Camaro, as well as a heating element, various glassware, tubing, and rubber stoppers.[2] The officer also found in the back of the Camaro an unlocked safe and a telephone bill in Gary Lott's name.

A search of the motel room also revealed evidence of materials associated with methamphetamine manufacturing, including coffee filters, used tubing,

---

[2] Officer Fitzwilliam's testimony indicates that these items were found on the "passenger's side floorboard," "in the back," and in "the rear" of the Camaro.

plastic baggies, and white powder residue. In addition to these materials, the police found a vehicle registration receipt indicating that a pickup truck was registered to "Gary and/or John Lott" at the Triple X Road address. The government sought to enter this receipt at trial as Exhibit 21.

On February 17, 1999, a federal grand jury delivered a multi-count indictment, charging Gary Lott on the following counts: Count 1 alleged that the co-defendants conspired to manufacture and distribute methamphetamine in violation of 21 U.S.C. § 841 (a)(1), incorporating by reference counts 2-12, resulting in a total of 127.8 grams of mixture of methamphetamine. Counts 6, 7, and 8 charged Gary Lott with maintaining a residence for the purpose of manufacturing methamphetamine in violation of 21 U.S.C. § 856 (a)(1). Count 10 charged him with possession of listed chemicals with intent to manufacture methamphetamine in violation of 21 U.S.C. § 841(d)(1). Count 11 charged him with attempting to manufacture methamphetamine in violation of 21 U.S.C. § 846, but that count did not state a quantity. Finally, Count 12 charged him with knowingly carrying and possessing a firearm, the 9 mm Sig-Sauer found in the Camaro, during and in relation to and in furtherance of the drug trafficking offense of attempting to manufacture methamphetamine, in violation of 18 U.S.C. § 924(c)(1). After a four day trial, ending on July 30 1999, the jury found Gary

Lott guilty on all counts. As with most pre-Apprendi cases, the jury was instructed that it did not have to find drug quantity beyond a reasonable doubt.

Gary Lott filed objections to the Presentence Report (PSR), claiming that it failed "to define or articulate with specificity the source of the information regarding the drug quantities and purity relied upon in making the drug quantity determination." On April 7, 2000, the district court adopted the PSR's recommended terms of imprisonment and sentenced Gary Lott to life terms for Counts 1 and 11, to run concurrently; 240 months on each of Counts 6, 7, 8, and 10, also to run concurrently to his life sentence; and 60 months on Count 12, which was not to run concurrently with any other term of imprisonment.

The grand jury also indicted Johnny Lott on Count 1 (conspiracy), and Counts 2, 3, and 4 charged him with distributing the following amounts of a mixture or substance containing methamphetamine: 28.3 grams (Count 2), 29.6 grams (Count 3), and 55.8 grams (Count 4), all in violation of 21 U.S.C. § 841(a)(1). Count 9 alleged that Johnny Lott maintained the 24th Street premises for the purpose of distributing a mixture or substance containing methamphetamine in violation of 21 U.S.C. § 856 (a)(1). The jury, which also was instructed that it did not have to find drug quantity beyond a reasonable doubt, found him guilty of all counts charged.

Johnny Lott also filed objections to the PSR, contesting the accuracy of the report's methamphetamine calculation and claiming that the government had failed to show by a preponderance of the evidence the drug quantities attributed to him. On June 13, 2000, the district court reduced the offense level stated in the PSR by two levels and sentenced Johnny Lott to thirty year sentences on each of Counts 1, 2, 3, and 4, and to a twenty year sentence on Count 9. All of his sentences were to run concurrently with each other.

After conviction but prior to his sentencing, Johnny Lott filed a total of five pro se motions with the district court between October 1999 and March 2000, claiming, in large part, that he was dissatisfied with his counsel's representation of him at trial. In his second and third motions, Johnny Lott alleged communication problems with his attorney, stating that his counsel "failed to communicate or interview defendant either before or after trial," that "defendant has written to counsel to no avail," and that Johnny Lott had not "been able to establish any sort of contact" with his attorney. (Id.) Lott asked the court for "remedy and protection." The district court denied the second and third motions in an order stating that "even if [Lott's criticisms are] deemed a request for new counsel, the defendant has not made the required showing." The district court also expressed concerns about appointing new counsel "at this stage of the proceedings" due to the complex nature of sentencing in a drug conspiracy case

and the factual showings that were "uniquely within present counsel's knowledge of the evidence and material circumstances."

Johnny Lott's fourth motion stated that this counsel "failed to ever contact [him] prior to jury trial" except to inform him of court dates and that he no longer wanted his attorney to be involved in his case. The district court characterized Johnny Lott's letter as "complaining of insufficient contacts by counsel" and as arguing that his counsel failed to defend him properly. The court denied the motion, noting that defendant had not requested new counsel or elected to represent himself pro se. "If defendant wishes to pursue his complaint with specific requests and particularized complaints so that the court will have a basis for consideration," the district court's order read, "he may do so."

Johnny Lott filed a fifth motion requesting "effective counsel to be appointed" for the remainder of the post-conviction proceedings, due to previous counsel's "wrongfull [sic] defense and failure to confer or advise the defendant or allow the defendant any input." The district court denied the motion, stating that defendant had sent the court correspondence "containing general complaints about his attorney" and "conclusory statements about his counsel's inadequacies." The court-appointed counsel of which Johnny Lott complained continued to represent him at the sentencing proceedings on June 9, 2000.

On appeal, both Gary and Johnny Lott raise <u>Apprendi</u> challenges to their sentences on the drug counts, claiming that their sentences exceed the statutory maximum, and therefore, that it was error for the jury not to be instructed that it had to find drug quantity beyond a reasonable doubt, and that Count 11 should have stated drug quantity as an element of the offense. They urge that because of these errors, we should vacate and remand their sentences.

Additionally, Gary claims that the district court erred in failing to suppress the testimony of certain government witnesses, such as Judy Jackson, who received benefit for their testimony. He also argues that the district court erred in not sustaining his motion for acquittal on Count 12 for possession of a firearm.

Johnny Lott claims that the district court erred in admitting exhibit 21 (truck registration receipt) and 68 (postal form), arguing on appeal that they were hearsay. He also contends that the district court's failure to conduct an inquiry into his complaints about counsel prior to sentencing require us to remand his case for resentencing. We address each of these claims in turn.

## II. <u>Apprendi</u> Claims

### A.

After Gary and Johnny Lott's trial and sentencing, the Supreme Court decided <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), which held that "[o]ther

than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. We apply Apprendi to cases pending on direct review. See Griffith v. Kentucky, 479 U.S. 314, 328 (1987). Guided by the rationale of Apprendi, we have held that the quantity of drugs involved for an offense under 21 U.S.C. § 841[3] is an "essential element" that must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt if that fact exposes the defendant to a heightened maximum sentence under the enhancement provisions of § 841 (b)(1)(A) or (b)(1)(B). See United States v. Jones, 235 F.3d 1231, 1236-37 (10th Cir. 2000). On appeal, Gary Lott contends that his life sentences for Counts 1 and 11, as sentenced under § 841 (b)(1)(A),

---

[3] This drug statute, 21 U.S.C. § 841(a)(1), makes it unlawful for a person knowingly or intentionally "to manufacture, distribute, or dispense or possess with intent to manufacture, distribute, or dispense, a controlled substance." Section 841(b) delineates minimum and maximum penalties depending on the quantities of drugs involved. Subsections (b)(1)(A) and (B) are referred to as "enhancement" provisions, because they allow for a greater maximum sentence than the "catch-all" subsection (b)(1)(C). See United States v. Jones, 235 F.3d 1231, 1236 (10th Cir. 2000) (stating that subparagraphs (A) and (B) provide for "enhanced sentences"). Specifically, § 841(b)(1)(A)(viii) states that a violation involving 500 grams or more of a mixture containing methamphetamine shall result in a term of imprisonment not less than 10 years or more than life. Similarly, § 841(b)(1)(B)(viii) states the minimum sentence of 5 years and a maximum of 40 years for violations involving 50 grams or more of a mixture containing methamphetamine. Subsection 841(b)(1)(C) states that in the case "of a controlled substance in schedule I or II . . . , except as provided in subparagraphs (A), (B), and (D)," the term of imprisonment shall not exceed 20 years.

run afoul of Apprendi because the indictment failed to state a quantity of drugs in Count 11, and because the jury was not instructed that it had to find drug quantity beyond a reasonable doubt for either count. Similarly, Johnny Lott challenges on Apprendi grounds his thirty year sentences on Counts 1, 2, 3, and 4, all under § 841 (b)(1)(B), because the jury was not instructed that it had to find drug quantity beyond a reasonable doubt.

B.

We must first determine what standard of review to apply to the various alleged errors made by the district court in imposing the defendants' sentences. In his brief, Gary Lott concedes that he "did not make Apprendi type objections," which he defines as objecting to being sentenced above the statutory maximum for drug quantities when the drug quantities were neither alleged in the indictment nor required to be found beyond a reasonable doubt by the jury. We consider in turn each of the Apprendi errors alleged on appeal—the failure of the indictment to state a quantity of drugs and the failure properly to instruct the jury that it must find drug quantity beyond a reasonable doubt.

In United States v. Cotton, 122 S.Ct. 1781 (2002), the Supreme Court recently analyzed an alleged Apprendi error based on an indictment's omission of drug quantity. In that case, as here in Count 11, the "indictment did not allege any of the threshold levels of drug quantity that [could] lead to enhanced

- 12 -

sentences." Id. at 1783. The defendants, nevertheless, were sentenced under § 841(b)(1)(A), and received terms of imprisonment for the indictment in excess of the twenty year maximum provided for in § 841(b)(1)(C). See id. at 1783-84. Below, a divided panel of the Fourth Circuit held that although the defendants had not raised their Apprendi argument before the district court, the indictment's failure to include an essential element of the offense was jurisdictional. United States v. Cotton, 261 F.3d 397, 405 (4th Cir. 2001). Therefore, the error required the court to vacate the sentences and remand because such an error "seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. at 406.

A unanimous Supreme Court reversed, holding that such an omission from an indictment is not jurisdictional, and proceeded to analyze the indictment's defect under the plain-error test of Federal Rule of Criminal Procedure 52(b) ("Fed.R. Crim. P."). Cotton, 122 S.Ct. at 1785. Following the Court's example, we will apply that plain error analysis, as defined by the Court in United States v. Olano, 507 U.S. 725, 732 (1993).[4]

---

[4] In United States v. Prentiss, 256 F.3d 971 (10th Cir. 2001) (en banc), we held that the failure of an indictment to state an essential element was subject to harmless error review. Id. at 981. Prentiss did not deal with an Apprendi challenge to a defective indictment, and some of our post-Prentiss cases, in the absence of a constitutional objection below, have continued to apply a plain error analysis to indictments that failed to state a quantity of drugs. See United States

(continued...)

- 13 -

With respect to the unpreserved error of the jury's failure to find drug quantity beyond a reasonable doubt, we also believe that our review should be for plain error under Fed.R. Crim. P. 52 (b), as opposed to the "harmless beyond a reasonable doubt" standard under Chapman v. California, 386 U.S. 18, 24 (1967), for preserved constitutional error. See United States v. Guevara, 277 F.3d 111, 123 (2d Cir. 2001); United States v. Fields, 251 F.3d 1041, 1044-45 (D.C. Cir. 2001); United States v. Candelario, 240 F.3d 1300, 1303 (11th Cir.), cert. denied, 533 U.S. 922 (2001); United States v. Terry, 240 F.3d 65, 72-73 (1st Cir.), cert. denied, 532 U.S. 1023 (2001). Although Gary Lott notes that he objected to the calculation of drug quantity at sentencing,[5] this objection failed to present the constitutional claim now presented on appeal. As the court explained in

---

[4](...continued)
v. Lujan, 268 F.3d 965, 967 (10th Cir. 2001); United States v. Price, 265 F.3d 1097, 1107-08 (10th Cir. 2001), cert. denied, 122 S. Ct. 2299 (2002). We need not comment on the application of Prentiss to non-Apprendi claims in the wake of Cotton, as we are guided by the Court's recent instruction that we review Apprendi challenges to an indictment's omission of drug quantity for plain error where no constitutional objection was raised below. See Cotton, 122 S.Ct. at 1785.

[5] Specifically, Gary Lott claimed in his objections to the PSR that it "fail[ed] to define or articulate with specificity the source of information regarding the drug quantities and purity relied upon in making the drug quantity calculations." Johnny Lott objected to "the accuracy of the computations of methamphetamine" for which he was found accountable in the Presentence Report (PSR). In fact, Johnny Lott's objection requested only that the government "prove by a preponderance of the evidence" that he distributed the amounts of methamphetamine listed in the PSR. Clearly these objections did not present the constitutional argument presented on appeal.

Candelario, a defendant may raise a constitutional objection in Apprendi cases by invoking that decision or Jones v. United States, 526 U.S. 227, 243 n. 6 (1999), or by claiming that

> the issue of drug quantity should go to the jury, . . . that an element of the offense was not proved, that the judge cannot determine quantity, or that quantity must be proved beyond a reasonable doubt (and not by a preponderance of the evidence).  However, a defendant's objection to the quantity of drugs that the Government attributes to him is not, on its own, a constitutional objection.  Such an objection is properly characterized as either an evidentiary objection or a sufficiency of the evidence objection.

240 F.3d at 1304 (internal quotation marks and citations omitted).  Compare Guevara, 277 F.3d at 116, 123-25 (reviewing Apprendi claims for plain error despite defendant's objections at sentencing to drug quantity found in PSR); Fields, 251 F.3d at 1044-45 (finding that defendants' objection based "only on the grounds that calculations [of drug quantity] were speculative" merited review for plain error only); United States v. Pease, 240 F.3d 938, 943-44 (11th Cir.) (reviewing Apprendi claim under plain error even though "the amount of cocaine involved in the offense was disputed at sentencing"), cert. denied, 122 S.Ct. 381 (2001); Terry, 240 F.3d at 72-73 (finding that defendant's objections to the amount of drugs "did not address the failure to [submit the issue of drug quantity] to the jury for proof beyond a reasonable doubt," thereby meriting only plain error review); and United States v. Swatzie, 228 F.3d 1278, 1280-81 (11th Cir. 2000) (same), cert. denied, 533 U.S. 953 (2001), with United States v. Garcia-Guizar,

- 15 -

234 F.3d 483, 488 (9th Cir. 2000) (finding defendant's objection based on <u>Jones</u> that the issue of drug quantity must be presented to the jury to be a constitutional objection that preserved error), <u>cert. denied</u>, 532 U.S. 984 (2001); <u>United States v. Nealy</u>, 232 F.3d 825, 828-29 (11th Cir. 2000) (same), <u>cert. denied</u>, 122 S.Ct. 552 (2001); <u>and</u> <u>United States v. Doggett</u>, 230 F.3d 160, 162-63, 165 (5th Cir. 2000) (same), <u>cert. denied</u>, 121 S.Ct. 1152 (2001). <u>But see</u> <u>United States v. Humphrey</u>, 287 F.3d 422, 445-46 (6th Cir. 2002) (finding itself bound by circuit precedent that an objection to the quantity of drugs is sufficient to preserve an <u>Apprendi</u> error but acknowledging that "several" of its sister circuits "have held that factual challenges to the calculation of drug amounts in the district court, by itself, may be insufficient to preserve the <u>Apprendi</u> issue on appeal").[6]

## C.

Turning to the facts of this case, we proceed to evaluate whether either the alleged indictment error in Count 11 or jury instruction errors on all counts

---

[6] This standard of reviewing for plain error in <u>Apprendi</u> cases when no constitutional objection was made below is analogous to our cases in which we review hearsay objections. In that context, an appellant must lodge an objection premised on a violation of his Sixth Amendment right to confrontation to preserve the issue for constitutional harmless error review. "Where a Confrontation Clause objection is not explicitly made below we will not address the constitutional issue in the absence of a conclusion that it was plain error for the district court to fail to raise the constitutional issue sua sponte." <u>United States v. LaHue</u>, 261 F.3d 993, 1009 (10th Cir. 2001) (alteration and internal quotations marks omitted); <u>United States v. Perez</u>, 989 F.2d 1574, 1582 (10th Cir. 1993) (en banc).

constitute plain error.  Under a plain error review, "[r]eversal is only warranted if there is: (1) an error; (2) that is plain or obvious; (3) affects substantial rights; and (4) 'seriously affect[s] the fairness, integrity[,] or public reputation of judicial proceedings.'"  United States v. Cernobyl, 255 F.3d 1215, 1218 (10th Cir. 2001) (quoting United States v. Hishaw, 235 F.3d 565, 574 (10th Cir. 2000) (quoting United States v. Olano, 507 U.S. 725, 732 (1993)), cert. denied, 533 U.S. 908 (2001)).  The government concedes, as it must, that imposing sentences in excess of twenty years on counts where drug quantity was omitted from the indictment (Count 11) or where the jury was not instructed that it must find drug quantity beyond a reasonable doubt (Counts 1, 2, 3, 4, and 11) constitutes "error" that is "plain."  See United States v. Price, 265 F.3d 1097, 1108 (10th Cir. 2001) (concluding that failure to sentence under  § 841(b)(1)(C) where indictment failed to state a quantity and jury not instructed to find quantity beyond a reasonable doubt satisfied first two prongs of plain error test), cert. denied, 122 S.Ct. 2299 (2002); Cernobyl, 255 F.3d at 1220 (same); United States v. Keeling, 235 F.3d 533, 538-39 (10th Cir. 2000) (same), cert. denied, 533 U.S. 940 (2001).  Accordingly, we turn our attention to the third prong–whether the errors affected defendants' substantial rights.

For an error to have affected substantial rights, "in most cases . . . means that the error must have been prejudicial: It must have affected the outcome of the

district court proceedings." Olano, 507 U.S. at 734. In this case, neither Gary

nor Johnny Lott can show that the Apprendi errors affected their substantial rights

because their total length of imprisonment would not have been shorter even if

they were properly sentenced under § 841 (b)(1)(C), due to the mandatory

"stacking" requirement of § 5G1.2(d) of the United States Sentencing Guidelines

(Guidelines).[7]

> Section 5G1.2(d) of the Guidelines provides that
>
> If the sentence imposed on the count carrying the highest statutory
> maximum is less than the total punishment, then the sentence imposed on
> one or more of the other counts shall run consecutively, but only to the
> extent necessary to produce a combined sentence equal to the total

---

[7] In its briefs, the government failed to argue that application of § 5G1.2(d) of the Guidelines prevented a finding that defendants' substantial rights were affected by the Apprendi errors, and instead asserted that the plain error test was not satisfied because the defendants could not show that the errors affected the outcome, primarily due to the government's assertion that the evidence of drug quantity was overwhelming. We note, however, that this circuit did not hold that § 5G1.2 (d) was a mandatory provision until after oral argument in this case. See United States v. Price, 265 F.3d 1097, 1109 (10th Cir.) (filed Sept. 11, 2001). This court is "not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." United States Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 446 (1993) (quoting Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991)). "We are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." United States v. Sandoval, 29 F.3d 537, 542 n.6 (10th Cir. 1994) (internal quotation marks omitted). As will be discussed below, we believe that the record sufficiently demonstrates that application of the "stacking" principle of § 5G1.2(d) is the appropriate ground on which to resolve this case.

punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

U.S.S.G. § 5G1.2(d) (2001).

Section 5G1.2 addresses the interplay between statutory maximums and sentences arrived at through application of the Guidelines in sentencing multi-count indictments. "Total punishment," as defined in the commentary to the Guidelines, means the "combined length of sentences" and "is determined by the adjusted offense level." In other words, the "total punishment" is the sentence arrived at for all counts through application of the Guidelines, including determination of the base offense levels, application of grouping provisions, and calculation of other adjustments. The district court's ability to determine the "total punishment," based on drug quantities determined under a preponderance of the evidence standard, for defendants facing multiple convictions remains untouched by the Apprendi decision, so long as the sentence for a particular count is within the statutory maximum. See United States v. Buckland, 289 F.3d 558, 570-71 (9th Cir.) (en banc) (stating that Apprendi is not violated when district court applies Guideline § 5G1.2(d) to issue consecutive sentences under multiple counts in order to reach an appropriate total sentence under the Guidelines so long as no sentence under any one count exceeds the maximum allowable under Apprendi for that count in the absence of a jury determination of drug quantities

- 19 -

that would support an enhanced sentence under that count), <u>cert. denied</u>, 122 S.Ct. 2314 (2002).

We recently joined the majority of our sister circuits, who have held that application of § 5G1.2(d) is mandatory, as the section "speaks in terms of 'shall' rather than 'may.'" <u>Price</u>, 265 F.3d at 1108-09 (collecting cases in which courts have held § 5G1.2 (d) to be a mandatory provision). The mandatory application of § 5G1.2 (d) in multi-count indictment cases will often result in <u>Apprendi</u> errors failing to affect a defendant's substantial rights, when the district court's assessment of the total punishment equals the sentence the defendant originally received. The district court may not impose a sentence above the statutory maximum for any particular count, but it will be required under § 5G1.2 (d) to impose consecutive sentences "to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2 (d). We must therefore determine whether the imposition of consecutive sentences in each of the Lott's cases would have resulted in the total punishments determined by the district court. If so, then the <u>Apprendi</u> error does not affect their substantial rights, and the sentences of the district court will be affirmed. <u>See, e.g.</u>, <u>United States v. McLean</u>, 287 F.3d 127, 137 (2d Cir. 2002) (holding that <u>Apprendi</u> error did not affect substantial rights where, "in the absence of the error, the application of section 5G1.2(d) of the Guidelines would have resulted in the same term of imprisonment"); <u>United</u>

States v. Bailey, 286 F.3d 1219, 1222 (10th Cir. 2002) (same); United States v. Outen, 286 F.3d 622, 640 (2d Cir. 2002) (same); Buckland, 277 F.3d at 1184-86 (9th Cir. 2002) (en banc) (same); Price, 265 F.3d at 1109 (10th Cir. 2001) (same); United States v. Angle, 254 F.3d 514, 518 (4th Cir. 2001) (en banc) (same); United States v. Sturgis, 238 F.3d 956, 960-61 (8th Cir.) (same), cert. denied, 122 S.Ct. 182 (2001); United States v. Page, 232 F.3d 536, 540 (6th Cir. 2000) (same), cert. denied sub nom. Linton v. United States, 532 U.S. 935 (2001).

Before turning to the particulars of the defendants' charges and sentences, we clarify our holding in United States v. Jones, 235 F.3d 1231 (10th Cir. 2000), in which we instructed that "idle speculation" as to the sentence that the district court might impose on remand in a multi-count case would not prevent us from noticing Apprendi error and remanding for resentencing. Id. at 1238. At the time Jones was decided, we had not held that § 5G1.2 (d) was a mandatory provision, thereby preventing us from knowing what total punishment the district court would impose on remand. Here, however, we can determine with certainty that the district court will impose consecutive sentences until arriving at a combined sentence equal to the total punishment it determined for each defendant under the Guidelines, because a mandatory application of § 5G1.2 (d) requires nothing less. Therefore, there is no "idle speculation" as to what sentence the district court will impose.

- 21 -

1. <u>Gary Lott</u>

The quantity of drugs attributed to Gary Lott in his PSR resulted in a base offense level of 38. Two levels were added for emission of hazardous substance in Gary Lott's residences, pursuant to § 2D1.1 (b)(5), and four levels for being the leader of the conspiracy, pursuant to § 3B1.1(a), resulting in an adjusted offense level of 44. With a criminal history category of II and a total offense level of 44, the probation officer determined that the guideline for imprisonment was life.[8]

Although the district court altered the amounts of marijuana equivalent attributed to Gary Lott, it nonetheless found that the amount for which he was responsible was five to six times higher than that required for a base offense level of 38. In all other respects, it adopted the factual findings and Guideline application of the PSR, including the imprisonment range under the Guidelines— a life sentence. The court sentenced Gary Lott to concurrent life terms for Counts 1 and 11, the statutory maximum provided under 21 U.S.C. § 841(b)(1)(A). It also sentenced him to 240 month terms for Counts 6, 7, 8, and 10, which were also to run concurrently, and a 60 month term for Count 12, which was not to run concurrently with any other sentence imposed.

---

[8] The probation officer calculated the sentence using the 1998 Guidelines.

The question before us is whether, pursuant to § 5G1.2(d), the district court's mandatory imposition of consecutive sentences, as opposed to concurrent ones, on all of the counts would have equaled the life sentence he currently faces based on the erroneous sentencing under § 841(b)(1)(A). Counts 1 and 11, violations of 21 U.S.C. § 846, could carry a maximum sentence of twenty years each, as the quantity of drugs for each count was not proven beyond a reasonable doubt. Counts 6, 7, and 8, violations of 21 U.S.C. § 856 (a)(1), also could have carried a maximum sentence of twenty years each. Count 10, a violation of 21 U.S.C. § 841 (d)(1),[9] carries a maximum sentence of twenty years. Finally, Count 12, a violation of 18 U.S.C. § 924 (c)(1), carries a mandatory minimum of five years. Accordingly, the district court would have been required by § 5G1.2 (d) to order the maximum sentences on all of Gary Lott's drug convictions, as well as five years on his gun possession charge, and to run these sentences consecutively, resulting in a total consecutive sentence of 125 years. "Under these circumstances, [Gary Lott's] substantial rights were not affected by the Apprendi error," as a 125 year sentence is the effective equivalent of a life sentence. Price, 265 F.3d at 1109 (finding that defendant's substantial rights were not affected by

_____

[9] The 2000 amendments redesignated the section dealing with possession of chemicals with intent to manufacture a controlled substance as 21 U.S.C. § 841 (c)(1). See 21 U.S.C. 841 (2001) (historical and statutory notes). The text of the section remains unchanged.

Apprendi error resulting in a life sentence, where mandatory application of § 5G1.2 (d) would have resulted in a total consecutive sentence of 208 years on all of defendant's charges).

## 2. Johnny Lott

The quantity of drugs attributed to Johnny Lott in his PSR resulted in a base offense level of 38. Two levels were added for possession of a firearm during the offense, pursuant to § 2D1.1(b)(1), and four levels were added for his role in the conspiracy, pursuant to § 3B1.1(a). Based on a total offense level of 44 and a criminal history category of IV, the PSR reflected that the guideline punishment was life.

The district court held Johnny Lott accountable for a lesser amount of methamphetamine than the PSR did, resulting in a total offense level of 42. Under the Guidelines, the court calculated his imprisonment range to be 360 months to life. It imposed a 360 month term for Count 1, a violation of 21 U.S.C. § 846, and sentenced Johnny Lott under 21 U.S.C. § 841 (a)(1) to a 360 month sentence for each of Counts 2, 3, and 4. It also imposed a 240 month sentence for Count 9, a violation of 21 U.S.C. § 856 (a)(1). All sentences were to run concurrently to each other. We therefore must determine whether the imposition of consecutive sentences on these counts would equal the thirty year sentence that Johnny now appeals.

Because drug quantity was not proven beyond a reasonable doubt for Counts 1-4, the maximum sentence Johnny Lott could have received on each of these counts under 21 U.S.C. § 841 (b)(1)(C) is twenty years. Likewise, his charge under Count 9 carries a maximum sentence of twenty years. Running these sentences consecutively, as required by Guideline § 5G1.2(d), easily reaches the level needed to support a total sentence of thirty years. Therefore, the Apprendi errors did not affect Johnny Lott's substantial rights.

Finding that the Apprendi errors did not affect either defendant's substantial rights, we affirm the sentences imposed by the district court.

### III. Testimony of government witnesses

Gary Lott next challenges the district court's denial of his motion to suppress the testimony of certain government witnesses who received or perceived benefit for their testimony. In reviewing a motion to suppress, this court accepts "the district court's factual findings unless clearly erroneous," United States v. Bustillos-Munoz, 235 F.3d 505, 511 (10th Cir. 2000) (internal quotation marks omitted), and issues of law are reviewed de novo. United States v. Singleton, 165 F.3d 1297, 1299 (10th Cir. 1999) (en banc).

Gary Lott contends that the government's payment of $3,450 to Judy Jackson, one of its witnesses, as well as its offer to her of a reduced sentence in

return for her testimony, and the plea agreement of Jeffrey Wright, violated 18 U.S.C. § 201 (c)(2), a statute that prohibits "directly or indirectly, giv[ing], offer[ing], or promis[ing] anything of value to any person, for or because of" the testimony given by that person.

The thrust of Gary Lott's argument is that we should overrule our holding in United States v. Singleton, 165 F.3d 1297 (10th Cir. 1999) (en banc), that neither the United States nor an Assistant United States Attorney functioning within the official scope of the office are included within the prohibitions of 18 U.S.C. § 201 (c)(2). He does not present any evidence that there has been an en banc reconsideration of this issue or a contrary Supreme Court decision since the Singleton opinion was issued, nor does our research uncover any such cases. He also does not offer any grounds on which we should distinguish this case from Singleton.[10] This circuit's previous en banc decision in Singleton is controlling

---

[10] Singleton dealt with concessions that a prosecutor typically will offer to cooperative witnesses, such as plea agreements, and it limited its holding to those "concession[s] normally granted by the government in exchange for testimony," Singleton, 165 F.3d at 1302, which are offered within "the official scope of the office." Id. at 1298. Here, Gary Lott alleges that Ms. Jackson received financial payment in exchange for her testimony, which arguably might be less of a typical concession. However, on this record, Gary Lott has not shown that the money Ms. Jackson received from the FBI between October 1999 and March 1999 was in exchange for her testimony in July 1999, as opposed to reimbursement of expenses associated with the FBI's investigation of the Lotts and others. In fact, the government states that the money was for expenses, such as pager fees, rent, and utilities, and that these expenses were paid on a monthly basis. The record

(continued...)

on this panel.  See Calderon v. Kansas Dep't of Soc. & Rehabilitation Servs., 181

F.3d 1180, 1187 (10th Cir. 1999).  Accordingly, we affirm the district court's

decision not to suppress the testimony of Ms. Jackson.

## IV. Motion for Acquittal on Firearm Charge

Gary Lott also challenges the district court's denial of his motion for

judgment of acquittal on Count 12 of possession of a firearm in violation of 18

U.S.C. § 924 (c).  We review the "denial of a motion for judgment of acquittal de

novo, viewing the evidence in the light most favorable to the government."

United States v. Austin, 231 F.3d 1278, 1283 (10th Cir. 2000).  We must

determine whether there is evidence "from which a jury could find the defendant

guilty beyond a reasonable doubt."  See id.  Although we review the record to

determine if there is evidence to support the verdict, we do not "weigh the

---

[10](...continued)
also reflects that Ms. Jackson "made several buys for [law enforcement officials,]" made "controlled buys," gave them information, and showed them the location of "meth labs."  Gary Lott has also failed to provide us with Ms. Jackson's plea agreement with the state of Oklahoma, leaving us unable to discern whether the agreement established that receipt of money was conditioned on her testimony.  Thus, this record does not present to us the question of whether financial payments for testimony are unethical and outside the official scope of office so that Singleton is distinguishable.  See Model Rules of Prof'l Conduct R. 3.4 cmt. 3 (2002) ("[I]t is not improper to pay a witness's expenses . . . .  The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying.").  We leave that question for another day.

evidence or consider the credibility of the witnesses in making [our] determination." Id. Reversal is warranted "'only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Haslip, 160 F.3d 649, 652 (10th Cir. 1998) (quoting United States v. Wacker, 72 F.3d 1453, 1462-63 (10th Cir. 1995)).

In this case, Count 12 charged that on or about January 21, 1999, Gary Lott "knowingly carried and possessed a firearm, [the Sig-Sauer automatic pistol found in the Camaro] during and in relation to and in furtherance of a drug trafficking offense, that is, attempting to manufacture methamphetamine" in violation of 18 U.S.C. §924(c)(1). This count included two distinct offenses for which the jury could have found Gary Lott guilty. The statute provides an enhanced sentence for those "who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." §924(c)(1)(A) (emphasis added). "[A] crime denounced in the statute disjunctively may be alleged in an indictment in the conjunctive, and thereafter proven in the disjunctive." United States v. Powell, 226 F.3d 1181, 1192 n.4 (10th Cir. 2000). Accordingly, we must examine the evidence to determine whether the jury could have found Gary Lott guilty either of carrying a weapon during and in relation to a drug trafficking offense, or of possessing the weapon in furtherance of the drug trafficking offense. We find sufficient

- 28 -

evidence to support a jury finding that Gary Lott possessed a firearm in furtherance of his attempts to manufacture methamphetamine so we need not address the "carried" charge.[11]

Possession under § 924(c)(1) can be shown through either constructive or actual possession. See United States v. Wahl, 290 F.3d 370, 375-76 (D.C. Cir. 2002); cf United States v. Mackey, 265 F.3d 457, 460 (6th Cir. 2001) (analyzing charge under § 924(c)(1) and stating that defendant had conceded constructive possession of weapon under the statute). "A person has constructive possession when he or she knowingly holds ownership, dominion, or control over the object and the premises where it is found." United States v. Mills, 29 F.3d 545, 549 (10th Cir. 1994). "The government may prove constructive possession by circumstantial evidence." Id.

In this case, Officer Fitzwilliam testified that he saw Gary Lott "g[e]t in the driver's door and lean[] over the driver's seat inside the vehicle." Documents

---

[11] In his brief, Gary Lott does not argue forthrightly that the evidence is insufficient to support the "in furtherance of" prong of § 924(c)(1). He does, however, contest that he did not possess and transport the gun "during and in relation to" the drug trafficking crime–attempting to manufacture methamphetamine. He seemingly focuses on the elements of § 924(c)(1) prior to Congress's addition of the possession prong in 1998. See generally United States v. Iiland, 254 F.3d 1264, 1270-71 (10th Cir. 2001) (discussing the addition of the possession prong to § 924(c)(1). After reviewing the evidence, we find that it was sufficient to support a jury finding that Gary Lott possessed the gun "in furtherance of" attempting to manufacture methamphetamine.

were found inside the Camaro in Gary Lott's name, including a telephone bill and various documents found in an unlocked safe found in the vehicle. After arresting Gary Lott near the Camaro, the police found the gun in question, a loaded-nine-millimeter Sig-Sauer automatic pistol, sitting on the driver's seat. A rational juror could have inferred from this evidence that Gary Lott constructively possessed the gun. He seemingly had dominion and control over the vehicle, as evidenced by entering it, and over the gun, as he was leaning over the driver's seat minutes before the gun was found there. See United States v. Valdez-Gallegos, 162 F.3d 1256, 1262 (10th Cir. 1998) (stating that government need only present "some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the . . . contraband" (internal quotation mark omitted)).

We also believe that there is sufficient evidence to support an inference that the drug was used "in furtherance of" Gary Lott's drug trafficking activities. We recently have recognized factors helpful in analyzing whether a firearm was possessed in furtherance of a drug trafficking offense, including "the type of drug activity being conducted, the accessibility of the firearm, the type of firearm, the legal status of the firearm, whether the firearm is loaded, the proximity of the firearm to the drugs or drug profits, and the time and circumstances under which the firearm is found." United States v. Basham, 268 F.3d 1199, 1208 (10th Cir.

2001). Other circuits also have approved of these factors, first articulated in United States v. Ceballos-Torres, 218 F.3d 409, 414-15 (5th Cir. 2000), cert. denied, 531 U.S. 1102 (2001). See Wahl, 290 F.3d at 376; Mackey, 265 F.3d at 462. Although we have instructed that "mere possession of a firearm in proximity to drugs" would not require a finding that a weapon was possessed in furtherance of drug trafficking, it could be considered by the jury along with other circumstantial evidence to determine whether the defendant intended to possess the weapon "in furtherance of" drug trafficking. Basham, 268 F.3d at 1208. The Sixth Circuit has found that mere presence of a firearm in the same premises as a drug transaction is insufficient, and that it is essential that the weapon "be strategically located so that it is quickly and easily available for use." Mackey, 265 F.3d at 462.

In this case, a loaded, semi-automatic handgun was found on the driver's seat of the Camaro. Also found in the Camaro were various materials used in the manufacturing of methamphetamine, including a gallon each of toluene and acetone, a heating plate, various glassware, tubing, rubber stoppers, five bottles of pseudoephedrine tablets, a four once bottle of vita-blend, three sixteen ounce bottles of iodine tincture, and a safe. Thus, this case is distinguishable from United States v. Iiland, 254 F.3d 1264, (10th Cir. 2001), where "[t]here was no evidence that the guns and drugs were ever kept in the same place or that [the

defendant] kept the gun accessible when conducting drug transactions." Id. at 1274. We conclude that the placement of a loaded, semi-automatic weapon on the driver's seat of the car in which the instrumentalities of methamphetamine manufacturing were also found is sufficient evidence from which a jury could conclude that the purpose of the gun was to provide defense or deterrence in furtherance of attempting to manufacture methamphetamine. Therefore, we affirm the district court's denial of Gary Lott's motion for acquittal on his § 924(c)(1) charge.

## V. Hearsay Exhibits

Johnny Lott challenges the district court's admission of the truck registration receipt (exhibit 21) and the postal form (exhibit 68), claiming that they were inadmissible hearsay. Because he did not raise a hearsay objection to the admission of these exhibits at trial,[12] we review for plain error only. See

---

[12] Counsel for Johnny Lott objected to the admission of the truck registration receipt on the ground that is was "more prejudicial than probative" and that "no foundation" had been laid for it. Johnny Lott's counsel also objected to the admission of the postal form on the grounds that it was "more prejudicial than probative," that there was "no authenticity as to who wrote [Johnny's name on the form]," and that it had "no date." These objections, based on grounds other than hearsay, are insufficient to preserve the claim that Johnny Lott advances on appeal—that the exhibits were inadmissible hearsay. See United States v. Martinez, 76 F.3d 1145, 1150 (10th Cir. 1996) (explaining that because objection did not notify the district court that objection was based on hearsay rule

(continued...)

United States v. Martinez, 76 F.3d 1145, 1150 (10th Cir. 1996). Under this standard, we reverse a district court, inter alia, "only if we determine that admitting the statement placed the underlying fairness of the entire trial in doubt or affected [the defendant's] substantial rights." United States v. Rosario Fuentez, 231 F.3d 700, 708 (10th Cir. 2000) (internal quotation marks omitted). In this case, we find that admission of neither exhibit rises to reversible error.[13]

On appeal, Johnny Lott claims that besides the two contested exhibits, the government presented "very minimal proof that [he] was connected to his brother's drug activities." We disagree. Three separate witnesses testified extensively about Johnny Lott's involvement in the methamphetamine manufacture and distribution conspiracy and his activities for substantive Counts 2 and 3.[14] The government also presented an undercover agent who testified about a controlled buy from Johnny Lott. Although Johnny Lott argues that the government's three witnesses had credibility issues due to their own drug use and

_____

[12](...continued)
of evidence, claim of inadmissible hearsay on appeal would be reviewed for plain error only).

[13] Because we conclude that the information in the exhibits was not prejudicial, we need not decide whether their admission was actual error or whether the error was plain or whether the error casts doubts upon the underlying fairness of the entire trial.

[14] On appeal, Johnny Lott does not argue that admission of exhibits 21 and 68 merits reversal of his conviction on Count 4.

criminal records, this evidence was presented to the jury on cross-examination. Thus, we find that the admission of the exhibits did not affect Johnny Lott's substantial rights because there was ample evidence linking Johnny Lott to the conspiracy's drug activities and of his distribution as charged in Counts 2 and 3. Accordingly, we affirm the trial court's admission of exhibits 21 and 68.

## VI. Substitution of Counsel

Johnny Lott claims that the district court erred when it failed to conduct an inquiry into his requests for new counsel following trial and prior to sentencing. "We review a district court's refusal to substitute counsel for an abuse of discretion." United States v. Beers, 189 F.3d 1297, 1302 (10th Cir. 1999) (internal quotation marks omitted). "To warrant a substitution of counsel, the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." United States v. Padilla, 819 F.2d 952, 955 (10th Cir. 1987) (internal quotation marks omitted). Good cause for substitution of counsel consists of more than a mere strategic disagreement between a defendant and his attorney, see Beers, 189 F.3d at 1302; rather, there must be a total breakdown in communications. United States v. Doe #1, 272 F.3d 116, 124 (2d Cir. 2001).

A.  Right to a Hearing.

If a defendant makes sufficiently specific, factually based allegations in support of his request for new counsel, the district court must conduct a hearing into his complaint.  See Padilla, 819 F.2d at 956 n.1 ("[T]he district court should make formal inquiry into the defendant's reasons for dissatisfaction with present counsel when substitution of counsel is requested."); Doe #1, 272 F.3d at 123 (same); United States v. Young, 482 F.2d 993, 995 (5th Cir. 1973) (same); United States v. Jennings, 945 F.2d 129, 132 (6th Cir. 1991) (same); Smith v. Lockhart, 923 F.2d 1314, 1320 (8th Cir. 1991) (same); Schell v. Witek, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc) (same).

Hearings typically are crucial for what they add to a district court's knowledge in this context.[15]  They help a court determine whether an attorney-client conflict rises to the level of a "total breakdown in communication" or

---

[15]Formal inquiry may not be necessary, however, "where the defendant otherwise stated his reasons for dissatisfaction on the record."  Beers, 189 F.3d at 1302 (quoting United States v. Willie, 941 F.2d 1384, 1391 (10th Cir. 1991) (internal quotation marks and citations omitted)).  "[I]f the reasons proffered are insubstantial and the defendant receives competent representation from counsel, a court's failure to inquire sufficiently or to inquire at all constitutes harmless error."  Doe #1, 272 F.3d at 123.  Nor would a hearing be necessary if it would add nothing to the district court's understanding of the defendant's complaint—if, for example, the defendant were moving to substitute counsel solely based on something that his attorney did in the courtroom, in full view of the trial judge, and the attorney in open court had already stated the reasons for his or her conduct.

instead whether the conflict is insubstantial or a mere "disagreement about trial strategy [that] does not require substitution of counsel." United States v. Taylor, 128 F.3d 1105, 1110 (7th Cir. 1997). The types of communication breakdowns that constitute "total breakdowns" defy easy definition, and to our knowledge no court or commentator has put forth a precise definition. As a general matter, however, we believe that to prove a total breakdown in communication, a defendant must put forth evidence of a severe and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible.

In this case, Johnny Lott made a sufficient allegation of good cause to substitute counsel. After his conviction in July 1999 but before sentencing, he filed five pro se motions—from October 1999 to March 2000—alleging various dissatisfactions with his court-appointed attorney. In each motion, Johnny Lott told the district court that his attorney had completely failed to communicate with him. Although several of the earlier motions appeared to request a mistrial, the later two motions explicitly requested new counsel for all subsequent proceedings, which include sentencing. The district court denied those motions, stating that "defendant has not made the required showing." That finding, in the face of Johnny Lott's repeated assertions that his attorney failed to communicate with him and in the absence of conducting a hearing, was an abuse of the court's

discretion.  We therefore REMAND Johnny Lott's case to the district court for a

hearing into his allegations of a total breakdown in communication between him

and his attorney.[16]

B.      Standard to be applied at the hearing to determine whether Johnny Lott
        should be given new counsel and resentenced.

On rehearing, the district court should look for general guidance to our

decision in Romero v. Furlong, 215 F.3d 1107 (10th Cir. 2000) (addressing an

ineffective assistance of counsel claim in the habeas context), as it considers

whether there has been a complete breakdown in communication and what relief

should be provided.[17]  In Romero, we considered four factors when examining the

constitutional implications of a total breakdown in communication: 1) whether the

defendant's motion for new counsel was timely; 2) whether the trial court

adequately inquired into defendant's reasons for making the motion; 3) whether

the defendant-attorney conflict was so great that it led to a total lack of

communication precluding an adequate defense; and 4) whether the defendant

---

[16]Because Johnny Lott made none of his motions prior to the finding of guilt and because he only seeks new counsel for resentencing, this hearing will only implicate the sentencing stage of the trial.

[17]We rely on Romero here solely for its analysis of a breakdown in communications between a lawyer and client and if one is found to exist, what relief is appropriate.  As we stress below, infra at 42-43, we do not intend to conflate claims for ineffective assistance of counsel with motions to substitute counsel after a complete breakdown of communications.

substantially and unreasonably contributed to the communication breakdown.  Id. at 1113.

"Even if a defendant's counsel is competent, a serious breakdown in communication can result in an inadequate defense." United States v. Musa, 220 F.3d 1096, 1102 (9th Cir. 2000).  A defendant who cannot communicate with his attorney cannot assist his attorney with preparation of his case, including suggesting potential witnesses to call and trial strategies to pursue, discussing whether the defendant himself should testify, and helping formulate other bread-and-butter decisions that can constitute the core of a successful defense.  A trial court's failure to appoint new counsel when faced with a total breakdown in communication may thus constitute a denial of counsel in violation of the Sixth Amendment.[18]

As with most constitutional violations, however, that failure is subject to harmless error analysis under Chapman v. California, 386 U.S. 18 (1967). Chapman places "[t]he burden... on the government to prove beyond a reasonable

_____

[18]A complete breakdown in communication between a defendant and his attorney is not, however, equivalent to the complete denial of counsel held to be unconstitutional structural error in Gideon v. Wainwright, 372 U.S. 335, 344-45 (1963).  See Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991).  An attorney who cannot or does not communicate with his client may still be able to argue effectively on his behalf.  As we discuss below, however, the government's burden in proving a total communication breakdown to be harmless is an extremely heavy one.

doubt that an error is harmless." United States v. Miller, 111 F.3d 747, 751 (10th Cir. 1997). In this case, after the required hearing, if the district court finds that there was a total communication breakdown between Johnny Lott and his attorney, and the government fails to prove that the breakdown was harmless, Johnny Lott's sentence must be vacated and he should receive a new sentencing proceeding with new counsel.

We believe that harmless error analysis is appropriate in this context following the Supreme Court's decision in Arizona v. Fulminante, 499 U.S. 279 (1991). There, the Court stated that "most constitutional errors can be harmless," including violations of the Sixth Amendment. Id. at 306-07. That case applied harmless error review to the admission of a defendant's confession obtained in violation of the Fifth and Fourteenth Amendments. See id. at 311. In Coleman v. Alabama, 399 U.S. 1 (1970), the Court held that the denial of counsel to a defendant at a preliminary hearing in violation of the Sixth Amendment was subject to harmless error review, even though that hearing was a "critical stage" of the state's criminal process. See id. at 9-10. And in Gilbert v. California, 388 U.S. 263 (1967), the court applied harmless error review to a defendant's denial of counsel at a post-indictment lineup. See id. at 273-74. In neither Coleman nor Gilbert was there a "total deprivation of the right to counsel"—the "structural defect[]" that Gideon prohibits. Fulminante, 499 U.S. at 309.

-39-

Indeed, the <u>Fulminante</u> Court emphasized that such structural errors—"the category of constitutional errors which are not subject to harmless error" review—are limited in scope. <u>Id.</u> at 309-10. It listed five such errors, including total deprivation of the right to counsel. <u>See</u> <u>id.</u> The structural errors listed by the <u>Fulminante</u> Court are clear-cut violations whose presence a reviewing court can determine on the face of the record. By contrast, a claim of a total breakdown in communication will typically require some inquiry into the relationship and contact between the defendant and the attorney as well as an assessment of responsibility for the breakdown. <u>See</u> <u>Romero</u>, 215 F.3d at 1113-14. Brief disagreements or arguments will not suffice to prove total breakdown. And even an attorney who has had no communication with the client could conceivably provide such services that the lack of client communication could be shown to be harmless, whereas, in contrast, the total absence of an attorney could never be harmless because no attorney services are rendered at all. For these reasons, a total breakdown in communication should not be labeled structural error.

The proper analysis should be the <u>Chapman</u>'s harmless error analysis, where the government must prove that a total breakdown in communication was harmless beyond a reasonable doubt. Communication between a defendant and his attorney will often be crucial at the sentencing stage, as the attorney must learn as much as possible about the defendant and his background in order to

present mitigating factors on his behalf. If there was a total breakdown in communications at sentencing, the government will bear the substantial burden of showing that it was harmless beyond a reasonable doubt.

Three Circuits—the Seventh, Eleventh and District of Columbia—have applied, in lieu of Chapman's harmless error standard, the prejudice analysis of Strickland v. Washington, 466 U.S. 668 (1984), to a district court's failure to conduct a hearing based upon allegations of a total breakdown in communication. Those circuits require the defendant to show that but for the counsel's deficiencies, the result of the proceeding would have been different. See, e.g., United States v. Zillges, 978 F.2d 369, 372 (7th Cir. 1992); United States v. Calderon, 127 F.3d 1314, 1343 (11th Cir. 1997); United States v. Graham, 91 F.3d 213, 221 (D.C. Cir. 1996).[19] This, of course, is a very different test and much more onerous on the defendant than the Chapman harmless error test. Under Strickland, the defendant must prove that but for the error, there is a reasonable probability that the result of the proceeding would have been different. Under a Chapman harmless error standard, the government must prove beyond a

_____

[19]Even under a Strickland standard, these cases misstate the test. Strickland only requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. To require a showing, as articulated in Zillges, Calderon, and Graham, that "but for the counsel's deficiencies, the result of the proceeding would have been different" is not an accurate statement of the Strickland test, even if it were applicable.

reasonable doubt that the error was harmless.  We disagree with the use of Strickland's prejudice standard in this context for three reasons.

First, Strickland requires a reviewing court to examine the trial as a whole for fundamental unfairness.  See Strickland, 466 U.S. at 687.  By contrast, a defendant's Sixth Amendment right to counsel can be violated by the deprivation of that right at any critical stage of the proceedings against him.  See Geders v. United States, 425 U.S. 80, 91 (1976).[20]  Because motions to substitute counsel can be brought at any time—before, during or after trial—it is often impossible for a court to consider the trial as a whole when reviewing those motions. Strickland is therefore inapposite.

Second, if we were to conflate Strickland's ineffective assistance inquiry with a defendant's motion to substitute counsel, we would in effect be analyzing motions to substitute counsel as ineffectiveness claims, which must almost always be brought on collateral attack.  See United States v. Galloway, 56 F.3d 1239,

_____

[20]The Geders Court did not address harmless error.  But it is doubtful that harmless error would apply on the facts of that case, where the trial judge prohibited the defendant from speaking to his attorney during the overnight recess between the defendant's direct examination and cross-examination.  See Geders, 425 U.S. at 91-92.  An attorney's decision not to speak with his client under these limited circumstances would almost certainly receive a reviewing court's "considerable deference to an attorney's strategic decisions."  Bullock v. Carver, 297 F.3d 1036, 1044 (10th Cir. 2002).  By contrast, a court's decision to limit communication in that way could never be deemed a strategic decision of the attorney—and thus should not receive such deference.

-42-

1242 (10th Cir. 1995) (en banc). We would thus effectively eliminate a defendant's ability to bring a right to counsel claim on direct appeal. That we decline to do.

Third, it is at least possible for a defendant to receive effective assistance of counsel even in the face of no communication with his attorney, just as it is possible for a defendant to receive ineffective assistance of counsel when the defendant and counsel do communicate. Good communication does not guarantee effective assistance of counsel, and bad communication does not guarantee ineffective assistance of counsel. It is precisely because effective communication and effective assistance do not always correspond that the two claims should be analyzed separately. And in this regard, we note that regardless of how we or the district court decide Johnny Lott's motion to substitute counsel, the ruling on that issue is not preclusive of a collateral claim of ineffective assistance of counsel under Galloway.

## VII. Conclusion

For the reasons stated above, we AFFIRM the district court with respect to Gary Lott and AFFIRM the district court on all of Johnny Lott's claims except for the district court's orders denying Johnny Lott an evidentiary hearing on his claim of a total breakdown of communication with his counsel at the sentencing stage. As to those orders, we REVERSE and REMAND Johnny Lott's case to the district

-43-

court for a hearing into his complaint of a total breakdown in communication between him and his attorney.